**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

LYNNE A. DEVOE,                    ) Case No. EDCV 17-0299-JPR
                                   )
                    Plaintiff,     )
                                   ) **MEMORANDUM DECISION AND ORDER**
          v.                       ) **AFFIRMING COMMISSIONER**
                                   )
NANCY A. BERRYHILL, Acting         )
Commissioner of Social             )
Security,                          )
                                   )
                    Defendant.     )
_____    )

**I.    PROCEEDINGS**

     Plaintiff seeks review of the Commissioner's final decision
denying her application for Social Security disability insurance
benefits ("DIB").  The parties consented to the jurisdiction of
the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).
The matter is before the Court on the parties' Joint Stipulation,
filed October 30, 2017, which the Court has taken under
submission without oral argument.  For the reasons stated below,
the Commissioner's decision is affirmed.

## II. BACKGROUND

Plaintiff was born in 1974. (Administrative Record ("AR") 85, 100.) She completed 12th grade (AR 217) and last worked in construction and as a restaurant server (see AR 54, 66, 217).

In November 2012, Plaintiff filed an application for DIB, alleging that she had been disabled since July 21, 2011, because of scoliosis; a herniated disk; spinal stenosis; fibromyalgia; numbness in her right neck, shoulder, and arm; headaches; insomnia; anxiety; and depression. (See AR 85, 100, 196.) After her application was denied initially (AR 114-17) and on reconsideration (AR 119-23), she requested a hearing before an Administrative Law Judge (AR 126-27). A hearing was scheduled for June 3, 2015, but Plaintiff did not appear. (See AR 20; see also AR 135-46 (Apr. 15, 2015 notice of June 3 hearing), 147-48 (May 2, 2015 acknowledgment of receipt of notice of hearing), 149 (May 20, 2015 reminder of hearing), 151-53 (June 5, 2015 request to show cause for failure to appear at hearing), 154-55 (Plaintiff's June 18, 2015 response).)

A hearing was held on October 26, 2015. (AR 72-84.) Plaintiff this time appeared but was not represented by an attorney or other acceptable representative. (See AR 76-77.) The ALJ continued the hearing so that Plaintiff could obtain representation. (See AR 171.) A supplemental hearing was then held on January 28, 2016, at which Plaintiff, who was now represented by counsel, testified, as did a vocational expert. (AR 40-71.) In a written decision issued February 18, 2016, the ALJ found Plaintiff not disabled. (AR 20-39.) Plaintiff requested review from the Appeals Council (AR 14), and on January

17, 2017, it denied review (AR 1-6). This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and her claim must be denied.  § 404.1520(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed.  § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations.  § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  The

4

her past work; if so, she is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. <u>Drouin</u>, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. <u>Id.</u>

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 404.1520(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B. <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 21, 2011, the alleged disability-onset date. (AR 23.) At step two, he concluded that she had one severe impairment: degenerative disc disease of the lumbar spine. (<u>Id.</u>) At step three, he found that she did not have an impairment or combination of impairments falling under a Listing. (AR 27.)

At step four, the ALJ found that Plaintiff had the RFC to perform medium work. (<u>Id.</u>) Based on the VE's testimony, the ALJ concluded that Plaintiff could perform her past relevant work as a server. (AR 32.) Thus, the ALJ found Plaintiff not disabled.

---

Commissioner assesses the claimant's RFC between steps three and four. <u>Laborin v. Berryhill</u>, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

5

(Id.)

**V.   DISCUSSION**

Plaintiff argues that the ALJ erred in finding that she had no severe mental impairment (J. Stip. at 4-10, 15-18), evaluating her physical impairments (id. at 18-21, 24-26), and rejecting her subjective symptom testimony (id. at 26-27, 31-33).  Plaintiff also raises several challenges to the ALJ's evaluation of the medical-opinion evidence.  (See id. at 5-7, 8-10, 15-18, 20-21, 24-26.)  For efficiency, the Court addresses Plaintiff's arguments in an order different from that followed by the parties.  As discussed below, the ALJ did not err and remand is not warranted.

A.   The ALJ Properly Evaluated Plaintiff's Subjective Symptom Testimony

The ALJ found Plaintiff's allegations "less than fully" credible.  (AR 29.)  She contends that that was in error (J. Stip. at 26) and specifically challenges the ALJ's reliance on her supposedly "minimal activities of daily living" (id. at 27) and "lack of treatment that [was] more aggressive" (id. at 26).  The ALJ did not err in either regard, however, and offered an additional reason unchallenged by Plaintiff: her subjective symptom statements were unsupported by the medical evidence.  (AR 29.)  Accordingly, remand is unwarranted on this ground.

1.   Applicable law

An ALJ's assessment of the credibility of a claimant's allegations concerning the severity of her symptoms is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v. Heckler, 779 F.2d 528, 531 (9th

Cir. 1985) (as amended Feb. 24, 1986). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d at 1035-36; see also SSR 96-7p, 1996 WL 374186 (July 2, 1996).[2] "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

[2] Social Security Ruling 16-3p, 2016 WL 1119029, effective March 16, 2016, rescinded SSR 96-7p, which provided the framework for assessing the credibility of a claimant's statements. SSR 16-3p was not in effect at the time of the ALJ's decision in this case, however, and therefore does not apply. Still, the Ninth Circuit has clarified that SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (as amended) (alterations in original) (quoting SSR 16-3p).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

## 2. Relevant background

### a. *Plaintiff's Allegations*

Plaintiff completed an Adult Function Report on April 30, 2013. (AR 226-37.) She alleged being unable to work because of "excruciating" pain that inhibited her ability to lift, stand, walk, or bend over; the pain was located in her lower back, legs, buttocks, knees, feet, shoulders, arms, fingers, toes, neck, and

head.  (AR 226, 236.)  She could do such things as dress and
bathe only "as pain allow[ed]" and had trouble sleeping.  (AR
227.)  She nonetheless took care of her disabled husband, two
sons, cat, and dog.  (Id.)  She reported preparing her own meals
daily with help from her family (AR 228), doing "small" household
chores (id.; see also AR 236 ("folding laundry, light dusting,
wiping down counter[,] and . . . cooking")), going outside "a
lot" to sit on the grass (AR 229), driving a car (id.), going out
alone (id.), shopping in stores using an electric cart and with
the help of family (AR 229, 236), and being able to pay bills,
count change, handle a savings account, and use a checkbook or
money order (AR 229).

     She alleged having problems being "around people" and
claimed to be able to pay attention for only "6 seconds."  (AR
231.)  She reported, however, that she spent time with others.
(AR 230.)  She stayed home with her family, saw her mother and
father "once in a while," talked with her mother on the phone
three times a week, and "text[ed] [her] friends to see how they
[we]re."  (Id.)  She also took her son to soccer practice once a
week, though she would stay in the car, and she didn't "need
someone to accompany [her]."  (AR 230, 236.)

     At her January 28, 2016 hearing, Plaintiff testified that
she stopped working in July 2011 because she "couldn't walk."
(AR 52.)  At that time she experienced "shooting nerve pain" in
her left leg (AR 53) and later had surgery for her back (AR 56-
57).  The surgery "got rid of a . . . lot of pain," she stated,
but she then "lost all feeling in [her] feet."  (AR 57.)  She
testified that "most of the feeling" had "come back," however.

9

(Id.)

Plaintiff also couldn't "use [her] right hand" (AR 57-58),
experienced "migraine headaches" caused by pain shooting from her
arm up to her neck and "across [her] face" (AR 59), and had
problems with her knees (AR 58). When asked if one knee was
worse than the other, she stated that "it used to be the right
but it's now the left." (AR 58-59.) Because of her physical
impairments, she testified, she could sit for only "five minutes
without shifting," stand for only "10-15 minutes" without sitting
down or changing position, and walk only "about three blocks"
before having to rest for a "few minutes." (AR 60-61.) She
could also lift only a gallon of milk.[3] (AR 62.)

Plaintiff had problems with her memory as well. (Id.) She
had "little spaces" that she didn't remember, would be "told
stuff that [she didn't] remember being told," and could not read
a book and remember what she had read. (AR 62-63.) She watched
little television because she couldn't focus, and she stayed away
from friends. (AR 63.) She was married and lived with her
husband and two kids, who were 22 and 16. (Id.)

When asked about chores, Plaintiff stated that she could
"cook small meals" and drive. (AR 64.) She did not vacuum,
however, and laundry was brought to her and she would "hold it."
(Id.) Chores, she stated, were a "group effort." (Id.)

---

[3] A gallon of milk weighs approximately eight and a half
pounds. Hernandez v. Colvin, No. 1:12-CV-00330-SMS, 2013 WL
4041862, at *9 n.4 (E.D. Cal. Aug. 8, 2013).

b. *Plaintiff's Statements to Medical*

*Professionals*

In April 2013, Plaintiff's mental condition was evaluated by a consulting examiner. (AR 333-38.) She drove to the appointment "by herself" and was "on time." (AR 333.) She reported living with four family members. (AR 335.) She could take care of "self-dressing, self-bathing, and personal hygiene"; drive a car; pay bills and handle cash appropriately; go out alone; and "focus [her] attention." (Id.) She had "excellent or good" relationships with "family and friends" and had "no difficulty completing household tasks" or "making her decisions." (Id.) On a daily basis, she could "dress, bathe, cook, clean and do light household chores"; manage money; eat breakfast and make coffee; go grocery shopping and run errands; organize her home; eat lunch; watch television; do chores around the house; go outside and "sit with the dogs"; and "shower before going to bed." (Id.)

In May 2015, she reported to one of her own doctors that she was "able to manage her own medication," "remember[ed] appointments," "manage[d] finances," and "pa[id] bills without problem." (AR 486.) She was noted as being "fully ambulatory and independent in all activities of daily living." (Id.) She "dr[ove] a car." (AR 487.) She "visit[ed] the gym 3 times a week" and "follo[wed] a routine of weight training and cardiovascular exercise." (Id.) She "walked without assistance," and "[h]er gait was fluid." (Id.) She "was able to hear and read instructions." (AR 488.)

In October and November 2015, she reported to another of her

doctors that she had "Power of Attorney over her mother and [was] trying to help her with legal issues regarding her home." (AR 531, 539, 542, 681.) Her oldest son had "mental health problems and still live[d] at home," and she was "trying to get him appropriate medical care." (AR 532.) Her husband was "injured in 2009 during active duty," had a "cognitive disorder," and was "not able to drive," and Plaintiff was "his caretaker." (Id.) He was on disability. (AR 541.) She reported helping "her mother, her brother, her husband, and herself." (AR 536.) She also said that she and her youngest son traveled to San Diego to find her grandmother's grave. (AR 682.) She reported that "the whole family . . . rallied to care for each other." (AR 683.) Plaintiff denied any suicide plans or attempts. (AR 530.)[4]

Plaintiff's reports of taking care of her husband appear throughout the record. (See, e.g., AR 328 (Dec. 2012: Plaintiff reporting "tak[ing] care of her husband who suffer[ed] from PTSD" and that she "ha[d] additional stress [from] taking care of him"), 486 (May 2015: "Her husband suffered a back injury while in the military and is disabled."), 532 (Oct. 2015: stating that she was "caregiver" for disabled husband).) And she at one point indicated that her "[h]usband got [a] large stipend for her to be caregiver." (AR 510 (Feb. 2014).) She also often reported that she read books (see, e.g., AR 499 (reading ADD book, which became "[her] new Bible"), 502 (stating that she had questions for her

_____

[4] That same month, however, during one of her aborted hearings, when the ALJ expressed frustration that Plaintiff had not yet gotten a proper representative and declined her request that he "be gentle" with her, she threatened, "I could leave the room and kill myself, okay?" (AR 82.)

psychiatrist regarding "meds and [a] book she[ was] reading"),
540 (reading "books about multiple personality"), 633 (discussing
ADHD book and stating that she "derive[d] some benefit from
that")) and was exercising (see, e.g., AR 629 (Mar. 2015:
"exercising 3 times a week"), 487 (May 2015: "visits the gym 3
times a week and follows a routine of weight training and
cardiovascular exercise")).

c. <em>Physical-Health Medical Evidence</em>

Near the start of the relevant period, in September 2011,
Plaintiff complained of pain in her back and left hip and leg.
(AR 424.)  A lumbar-spine x-ray at that time revealed "[n]o
evidence of acute fractures, subluxation or significant disc
space narrowing." (AR 373.)  In October, she reported being
"frustrated that [the] xray was normal" and continued to have
"mild" lower back pain but "severe" pain in her leg. (AR 421.)
On examination she demonstrated "no abnormality" in her back,
normal extension, negative straight-leg raising, and "intact"
balance and gait. (AR 422.)  She was "positive," however, for
posterior tenderness and "left tenderness from L2 to L5" with
palpation. (Id.; see also AR 418-20 (Nov. 2011: "L spine exam
identical to prior notes/encounters").)

On November 14, 2011, Plaintiff began seeing orthopedic
surgeon Amir David Tahernia for her back and left-leg pain. (AR
370-71; see also AR 554.)  She reported that she experienced pain
after she "overdid it" with "some vigorous activity" while
"vacationing with her family in August" of that year. (See AR
370.)  On examination, Dr. Tahernia found no tenderness in her
back, but her range of motion was "[l]imited in all planes" and

13

she had "4/5 hip flexion, knee extension, and weakness on the left." (AR 371.) Dr. Tahernia ordered an MRI of her lumbar spine (AR 372), which was completed later that month (AR 466-68). The MRI revealed that at the "L4-5" disc level she had "mild decreased disc height loss," "partial disc desiccation," "disc bulge with . . . mild bilateral ligamentum flavum buckling and facet arthropathy that contribute[d] to moderate to severe bilateral subarticular zone stenosis abutting/compressing the bilateral descending L5 nerve roots and to mild bilateral neural foraminal narrowing," and "[m]ild bilateral reactive facet arthropathy." (AR 467.) She also had a disc bulge with "mild bilateral ligamentum flavum buckling and facet arthropathy" at the "L5-S1" disc level, which contributed to "mild bilateral subarticular zone stenosis encroaching upon the bilateral descending S1 nerve roots." (Id.) Dr. Tahernia reviewed the results with Plaintiff and recommended her for a "left L5 transforaminal epidural steroid injection." (AR 368.)

The injection was administered on December 7, 2011. (AR 366-67.) At her follow-up appointment a month later, Plaintiff reported that the injection was "helpful," "[o]verall she . . . improved," and she was "slowly getting back to the gym" and exercising. (AR 365.) She still had "some intermittent low back pain," however, and Dr. Tahernia recommended her for more injections. (Id.) She received one later that month, on January 30, 2012. (AR 363-64.) She reported in February to another doctor that it "did not help as much" as the first injection. (AR 415.)

Plaintiff next saw Dr. Tahernia in May 2012, complaining of

14

back, left-leg, and neck pain as well as bilateral upper-extremity paresthesias. (AR 361.) Dr. Tahernia noted that by that point she had "undergone a full course of left L5" steroid injections, which were "therapeutic and diagnostic," but she nonetheless "developed some recurrent back and lower left leg pain." (Id.) He reviewed Plaintiff's MRI again and conducted a physical exam, finding "no specific tenderness to palpation in [her] lumbar spine" but "decreased" sensation along the lateral aspect of her left leg. (Id.) He found her to be "a candidate" for "microdecompression L4-5, left-sided" surgery. (AR 362.) Plaintiff wanted to "consider options" (id.) and did not receive that surgery until May 2014 (AR 554-55; see also AR 359 (June 2013: "unable to undergo surgery at this time due to family issues")).

During the rest of 2012, Plaintiff complained of abdominal pain, various muscle pains on the right side of her body, "tingling" in her right arm, neck pain, and headaches. (See AR 413-14 (July 2012), 293-94 (Sept. 2012), 297-98 (Sept. 2012).) In October, she underwent an "EMG" nerve-conduction study, which revealed "mild ulnar neuropathy" in her right elbow. (AR 299-300.) In December, she visited an arthritis clinic. (AR 321-31.) On examination, she demonstrated "normal range of motion" in her shoulders, no swelling or tenderness in her elbows or wrists, no pain in her hips with rotation, full range of motion in her knees, and no swelling or tenderness in her ankles. (AR

330.) She was noted as already taking Vicodin,[5] among other medications (AR 325), and was "restart[ed]" on Effexor[6] to "control[] her stress level." (AR 331.) An MRI of her cervical spine was also conducted that month and revealed no evidence of "stenosis or disc herniation." (AR 464-65.)

In May 2013, Plaintiff was evaluated by consulting examiner Sean To, who specialized in internal medicine, and complained of neck and back pain and fibromyalgia. (AR 340-47.) Her abdomen "appear[ed] to be normal" and exhibited "no tenderness to palpation." (AR 343.) She had "normal" range of motion in her upper-extremity joints and "mild tenderness to palpation" in her shoulders, elbows, and trapezius muscles. (Id.) She had "normal" range of motion in her lower-extremity joints, "mild tenderness to palpation" in her knees and ankles, and "moderate tenderness to palpation" in her left hip. (Id.) Her spine showed "mild tenderness to palpation" and a range of motion, with "no discernible limitation in any plane." (AR 343-44.) Her straight-leg-raising test results were "negative," and her hands and feet revealed "no significant deformities." (AR 344.) She was able to manipulate the use of a pen "with ease," did not "restrict the use of either hand during the examination," could

_____

[5] Vicodin is a name-brand version of a narcotic hydrocodone-acetaminophen product used to relieve moderate to severe pain. Hydrocodone Combination Products, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601006.html (last updated Jan. 15, 2018).

[6] Effexor is the name-brand version of venlafaxine, a selective serotonin and norepinephrine reuptake inhibitor used to treat depression. See Venlafaxine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a694020.html (last updated Dec. 15, 2017).

make a fist bilaterally "without difficult[y]," and adequately achieved "[p]inch positioning." (Id.) She had "5/5" muscle strength (id.) and a "normal gait" (AR 345). Dr. To concluded that Plaintiff could lift and carry "50 pounds occasionally and 25 pounds frequently" and stand and walk for up to "6 hours in a normal 8-hour workday" but otherwise had no limitations or restrictions. (AR 345-46.)

In 2013, she continued to complain of pain in her back, leg, neck, and arm even though she had apparently attended physical therapy for two months that year and had epidural injections in January and May 2013 — all of which provided "no sense of relief." (See, e.g., AR 358-59 (June 2013).) A June 2013 x-ray showed an "essentially normal-looking cervical and lumbar spine." (AR 360.) That same month, however, she demonstrated tenderness to palpation in her back, pain when extending or rotating her back, painful but good range of motion in her shoulders, and normal strength in her upper extremities. (AR 356.) In July, an MRI of her thoracic spine showed no evidence of stenosis, neural foraminal narrowing, or disc herniation. (AR 461-63.)

In August 2013, Plaintiff also began to complain of pain in her right knee and noted "concerns about disability, which she [wanted] addressed." (AR 352.) On examination, she had some tenderness to palpation of her back and painful back extension and rotation, but she had "5/5" muscle strength and negative straight-leg raises bilaterally. (AR 353.) According to the attending orthopedic physician, Hazmer Cassim, there was no "clear-cut evidence of fibromyalgia," and Plaintiff's "many subjective complaints of pain exceed[ed] objective findings."

(Id.)  Dr. Cassim also examined her knees that month, following a complaint that her left knee began to hurt as much as the right; he noted that a "[f]ourteen-point review of systems" was "unremarkable," she had full range of motion in both knees, and she had "mild palpable tenderness" in her right knee but no tenderness in her left.  (AR 349-51.)  An x-ray of her knees conducted at that time showed "some very slight patellofemoral degenerative joint disease bilaterally" and a "small effusion on [her] right knee" but was "otherwise unremarkable."  (AR 350; see also AR 460 (Oct. 2013 MRI of left knee showing "subcentimeter focus of superficial chondral fissure formation and fibrillation overlying the median eminence of the patella" but "[o]therwise normal" results).)  In November 2013, she was diagnosed with "[p]atellofemoral syndrome bilaterally[,] right greater [than] left."  (AR 582-83.)

Plaintiff's physical-health medical records from 2014 primarily concern her decompression surgery in May 2014.  (AR 554-55.)  Following the procedure, Plaintiff reported "doing much better" and was "increasing her activities."  (AR 646.)  She was continued on antiinflammatory medication, Flexeril,[7] and Vicodin. (Id.)  An MRI of her lumbar spine completed in August 2014 showed "no evidence for spinal canal stenosis or disc herniation"; mild bilateral foraminal narrowing at the L4-L5 level, "consistent for lumbar spine decompression surgery"; and "reactive changes" at the "L2-L3, L3-L4, and L4-L5" levels, which "could represent

---

[7] Flexeril is a name-brand version of cylcobenzaprine, a skeletal muscle relaxant used to relieve pain.  Cyclobenzaprine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682514.html (last updated Feb. 15, 2017).

18

specific pain generators in the appropriate clinical setting."
(AR 569-71.)

She was next seen in June 2015 for pain and numbness in her left leg and foot and right knee. (AR 575-76, 642-43.) She demonstrated "decreased sensation" over her foot on examination; based on a CT scan apparently conducted in March 2015, there was no evidence of nerve compression in her right or left knee. (AR 642-43.) She was assessed with a "possible" left-toe cyst as well as "[l]eft leg radicular pain and neuropathy." (Id.; see also AR 580-81 (assessing Plaintiff with "[s]oft tissue mass [on the] plantar aspect of [left] toe").) She was seen again in July 2015 for "multi-site pain," and on examination she demonstrated some tenderness to palpation of her low back, pain while extending and rotating her back, "greater than 3/5" functional strength, and "[n]ormal" gait. (AR 577-79, 644-45.) There was no "clear-cut etiology for her symptoms." (AR 645.)

In October 2015, Plaintiff received a neurosurgical consultation. (AR 647-48.) She was noted as having "paresthesias in the left lateral foot and right ulnar distribution" but "equal and symmetrical" deep tendon reflexes, no pathological reflexes, and "symmetrical" gait. (AR 648.) Plaintiff's August 2014 lumbar-spine MRI was also reviewed, which showed no significant stenosis and "mild" disc bulges. (Id.) The bulges "d[id] not represent [a] severe enough problem to be causing [Plaintiff's] current symptoms" and were "somewhat more eccentric to the right at L4-5" even though her "symptoms [were] on the left." (Id.) She was nonetheless informed that she would "potentially benefit" from "sciatic nerve decompression at the

pelvic outlet" and "perineal nerve decompression at the fibular head." (Id.)

In December 2015, Plaintiff was seen by Dr. A. Nabet for pain in her right arm and shoulder. (AR 658-61.) She demonstrated no tenderness in her neck, spine, shoulders, elbows, or wrists and "intact" range of motion in her extremities. (AR 660.) An MRI of her right shoulder was ordered (AR 661) and was completed in January 2016 (AR 650-51). It indicated "mild findings" for bursitis and tendinosis. (AR 651.) Upon review of the MRI results and on examination, during which Plaintiff demonstrated pain and tenderness in her shoulders and right elbow, she was assessed with peripheral nerve-entrapment syndrome in her right elbow and lower left leg. (AR 655.) She demonstrated no tenderness in her neck, spine, or abdomen, however. (Id.) That same month, Dr. Nabet completed a physical RFC questionnaire and assessed that Plaintiff "constantly" experienced pain "severe enough to interfere with attention and concentration" and was "incapable of even 'low stress' jobs," among other limitations. (AR 663; see generally AR 662-66.)

At Plaintiff's January 2016 hearing, orthopedic surgeon Eric Schmitter testified as a medical expert. (See AR 43-52.) After reviewing the record, he found that there was no "significant orthopaedic pathology of note" (AR 44) and concluded that Plaintiff did not have less than a "medium" RFC (AR 45). In support of his findings, he testified that a lumbar-spine MRI from August 2014 "showed no evidence of stenosis," a right-shoulder MRI from January 2016 "showed mild bursitis and tendinitis," "[e]lectrodiagnostic studies showed some mild ulnar

changes at the right elbow but nothing of great significance," and an April 2013 internal-medicine exam "had no objective spine findings." (AR 44.) Moreover, the "mild ulnar s[h]owing at the right elbow" was a "common finding," and another examination indicated "normal nerve[s]." (AR 46 (citing AR 637-46).) Thus, "there [was] no evidence that there [was] significant sensory or motor deficit" (id.) and there were no records finding "any neurological deficits at all on . . . physical examin[ation]" (AR 51).

When asked about fibromyalgia, which Dr. Schmitter opined was the "probable cause of all of her symptoms," he testified that there was no "documentation to substantiate" that diagnosis. (AR 44-45 (finding no record with requisite pressure points).) When asked about a lumbar-spine MRI referenced by Dr. Tahernia in May 2012 (see AR 49 (citing AR 362)), Dr. Schmitter stated that there was no "examination evidence that there[ was] a L5 deficit," such as "muscle weakness or dermatomal sensory loss" (id.). Impressions of stenosis and radiculopathy were "potential problems" without "evidence that there [was] a neurologic deficit." (AR 50.) When asked about a November 2011 MRI of Plaintiff's lumbar spine, Dr. Schmitter stated that it was "as normal as you can get." (AR 50-51 (citing AR 466).) Plaintiff's attorney noted that the MRI found some "compression in the bilateral descending L5 nerve root," and Dr. Schmitter responded that that was only a "potential problem." (AR 51; see also AR 467.) He testified that "[i]f there were pressure on the L5 nerve root on the left, there should be corresponding examination findings resulting in L5 motor weakness . . . [a]nd that's not

evident anywhere in the records." (_Id._) Dr. Schmitter was also asked about the decompression surgery that Plaintiff underwent in May 2014. (_Id._) He indicated that there was no basis in the record to support that surgery. (AR 52.)

### d. _Mental-Health Medical Evidence_

#### i. _Dr. Bassanelli_

Plaintiff began seeing psychiatrist Anthony Bassanelli on January 15, 2014. (AR 512-19; see also AR 548.) At that time, she appeared "anxious," but she was oriented and stable and exhibited "[a]bove [a]verage" intelligence and "good" memory. (AR 517.) Though her thought forms were circumstantial and involved loose associations, her thought content was logical and reality based. (AR 517-18.) He assessed her with "PTSD"[8] and "ADHD" (AR 518), assigned her a Global Assessment of Functioning score of 55 (AR 519),[9] and prescribed Effexor (_id._). She had

---

[8] Plaintiff's posttraumatic stress disorder was noted by one psychologist as being "due to multiple factors," including "the death of her father" from cancer in 2013. (AR 684; see also AR 681-82 ("It was very traumatic [and] 'brutal' for [Plaintiff] to watch her father . . . die[.]"), 683-84 (describing Plaintiff's "trauma history").)

[9] A GAF score of 51 to 60 indicates moderate symptoms in one area or difficulty in social, occupational, or school functioning. See Diagnostic and Statistical Manual of Mental Disorders 32 (revised 4th ed. 2000). The Commissioner has declined to endorse GAF scores, Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50764-65 (Aug. 21, 2000) (codified at 20 C.F.R. pt. 404) (GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings"), and the most recent edition of the DSM "dropped" the GAF scale, citing its lack of conceptual clarity and questionable psychological measurements in practice, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012). Because GAF scores continue to be included in claimant medical records, however, the Social Security Administration has clarified that they are "medical

been using Effexor previously and stated that it "helped[,] even [with] whole body pain." (AR 513.)

Plaintiff followed up with Dr. Bassanelli in February 2014. (AR 510.) She stated that her "[h]usband got [a] large stipend for her to be caregiver" and that she was "feeling a little better," though "sleep remain[ed] a big problem," and she was noted as being "pleasant," "animated," "calmer," and "more focused." (Id.) She was compliant with her medication, and Dr. Bassanelli made no change because "she like[d] how she [was] feeling [and] want[ed] to remain at this dose for now." (Id.) The following month, however, Plaintiff reported being frustrated because her "current dose of Effexor [was] not as effective" and her "response to meds" decreased. (AR 509.) Dr. Bassanelli noted no change in her health and started her on Adderall.[10] (Id.)

By April 2014, Plaintiff had stopped using Effexor because it caused "blurry vision." (AR 507; see also AR 508.) She

opinion evidence under 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2) if they come from an acceptable medical source." Wellington v. Berryhill, 878 F.3d 867, 871 n.1 (9th Cir. 2017) (citing Richard C. Ruskell, Social Security Disability Claims Handbook § 2:15 n.40 (2017)). As with other medical-opinion evidence, the reliability of a GAF score depends on whether it is "consistent with the other evidence, the rater's familiarity with the claimant, and the credentials of the rater"; GAF scores "should not be considered in isolation." Ruskell, supra, § 2:15 n.40 (citing internal Social Security Administrative Message number 13066, which became effective July 22, 2013, and was revised on Oct. 14, 2014).

[10] Adderall is the name-brand version of a dextroamphetamine and amphetamine combination product, a central-nervous-system stimulant used to control the symptoms of ADHD. See Dextroamphetamine and Amphetamine, MedlinePlus, https:// medlineplus.gov/druginfo/meds/a601234.html (last updated Sept. 15, 2017).

reported being compliant with Adderall and said "she was able to be much more productive" on it. (AR 507.) She stated, however, that there were "too many side effects" from it, as she felt too "wired" and "speeded [sic] up." (Id.) Dr. Bassanelli started her on Vyvanse.[11] (Id.) A few weeks later, however, Plaintiff reported feeling "horrible," so Dr. Bassanelli discontinued it and prescribed her Diazepam "as needed for now."[12] (See AR 506.)

In June 2014, Plaintiff reported being "anxious but managing," and Dr. Bassanelli noted that she was "pleasant" and "not racing or pressured." (AR 505.) She requested "to go back [and] retry [Effexor]" and was cautioned about its blurred-vision side effect. (Id.) She was noted as being compliant with Diazepam, which had "fair" efficacy, and was restarted on Effexor. (Id.) She reported that her "zombie" behavior "went away" but her sleeping was "still awful." (AR 504.) By July, however, she was "frustrated" with her medications and began using "natural supplements." (AR 501; see also AR 500 (Aug. 2014: "continuing to manage as 'naturally' as possible").) At her November 2014 visit, Plaintiff continued to remain off psychiatric medication, and she reported to Dr. Bassanelli that she was reading an "ADD book" he had recommended to her, which became "[her] new Bible." (AR 499.) They discussed the book

---

[11] Vyvanse is the name-brand version of lisdexamfetamine, a central-nervous-system stimulant used to control symptoms of ADHD. Lisdexamfetamine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a607047.html (last updated Aug. 15, 2016).

[12] Diazepam is used to relieve anxiety, muscle spasms, and seizures. See Diazepam, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682047.html (last updated Apr. 15, 2017).

again in January 2015, and she reported "deriv[ing] some benefit from that." (AR 633.)

Throughout 2015, Dr. Bassanelli frequently noted that Plaintiff's cognition and recent and remote memory were "intact" and her thoughts were "goal-directed, logical and reality based" despite some observations of "poor concentration" or "anxious" mood. (See, e.g., AR 635 (Jan. 2015), 631 (Mar. 2015), 627 (same), 623 (Apr. 2015), 619 (May 2015), 615 (same), 608 (Aug. 2015), 604 (Sept. 2015), 600 (same).) Dr. Bassanelli referred Plaintiff for neuropsychological testing regarding her alleged problems with memory and learning (see AR 619-20; see also AR 606 ("[Plaintiff] is very focused on getting validation there is a real problem with [her] memory."), and that testing was completed in May 2015 by psychologist Anita Chatigny. (AR 484-96.)

Dr. Chatigny subjected Plaintiff to a variety of psychological tests (see AR 488-91) and found that she had an overall "[n]ormal" neuropsychological profile with the "capacity for full independence across all arenas of cognition as well as capacity for memory and new learning." (AR 492.) She also had "broad integrity of brain function and intellectual/cognitive abilities that are commensurate with the majority of others of similar age." (AR 488, 492.) Indeed, Dr. Chatigny noted that Plaintiff's "cognitive aptitude [was] higher than these scores would suggest." (AR 488.) There was, however, some indication of "diminished attention/concentration," which was "congruent with [a] diagnosis of Attention Deficit Disorder." (AR 491, 493.)

Dr. Bassanelli completed a mental RFC questionnaire in

December 2015.  (See AR 543-50.)  He opined that Plaintiff was "not capable of any type of employment due to her" mental-health issues, which included PTSD, "panic and anxiety," and "severe lack of attention and focus."  (AR 550.)  She had no "useful ability" regarding "[m]aintain[ing] attention for two hour segment[s]" and "[d]eal[ing] with normal work stress" and was unable to "meet competitive standards" for "[r]emember[ing] work-like procedures," "[u]nderstand[ing] and remember[ing] very short and simple instructions," and "[m]aintain[ing] regular attendance," among other things.  (AR 545-46.)  But she had the limited but satisfactory ability to "[c]arry out very short and simple instructions," "[m]ake simple work-related decisions," "[a]sk simple questions or request assistance," "[u]nderstand and remember detailed instructions," "[c]arry out detailed instructions," "[i]nteract appropriately with the general public," and "[m]aintain socially appropriate behavior."  (Id.)  She was also "[u]nlimited or [v]ery [g]ood" in her ability to "[b]e aware of normal hazards and take appropriate precautions," "[a]dhere to basic standards of neatness and cleanliness," "[t]ravel in unfamiliar place[s]," and "[u]se public transportation."  (Id.)

He noted that Plaintiff "carrie[d] notes and her appointment book with her to remain organized" and "always [came] on time for her appointments" (AR 549; cf. AR 545 (noting in same report that she had "[d]ifficulty coming on time for appointments")), but she tended to be "very anxious" and "irritable" and "struggle[d] in her interpersonal relationships."  (AR 549-50.)  Overall, he noted her prognosis as "[f]air."  (AR 543.)

1

ii.  *Dr. Monahan*

2     Plaintiff began seeing psychologist Rosalind Monahan for
3   psychotherapy in October 2015, on referral from Dr. Bassanelli.
4   (AR 529-33, 541-42.)  At their first visit, they discussed
5   Plaintiff's mental-health history and prior therapists; Dr.
6   Monahan noted that she had some memory impairment — but no lack
7   of concentration — and diagnosed her with PTSD.  (AR 541-42.)  At
8   their next visit a week later, they reviewed a homework
9   assignment completed by Plaintiff, and Plaintiff "shared
10  info[rmation] re[garding] books about multiple personality . . .
11  that she [had] read."[13]  (AR 540.)  Dr. Monahan noted no memory
12  impairment and no lack of concentration at that time.  (Id.)  The
13  following day, they met again, Plaintiff shared poetry that she
14  used to write, and she reported that she had power of attorney
15  over her mother, who "[was] almost homeless."  (AR 539.)  Dr.
16  Monahan noted no memory impairment or lack of concentration at
17  this or their next meeting.  (Id.; AR 538.)  Dr. Monahan noted
18  memory impairment but no lack of concentration at each of their
19  following sessions, however.  (AR 537 (Oct. 28, 2015), 536 (Nov.
20  4, 2015), 535 (Nov. 11, 2015), 534 (Nov. 18, 2015).)

21     In January 2016, Dr. Monahan completed a mental-disorder
22  evaluation form (AR 668-86), noting that Plaintiff had
23  "significant memory impairments," "disorganized thinking," and
24  "paranoia dissociation," among other symptoms (AR 668-69).  Dr.
25  Monahan assessed that she had limited but satisfactory ability to

26  _____

27       [13] At her hearing a few months later, Plaintiff claimed to
    be unable to "read a book and remember what [she'd] read."  (AR
28  63.)

carry out "very short and simple instructions" and make "simple work-related decisions" and was unlimited or very good in her ability to be aware of normal hazards, take appropriate precautions, and adhere to basic standards of neatness and cleanliness. (AR 672-73.) But she otherwise was seriously limited, was unable to meet competitive standards, or had no useful functional ability in all other aspects of mental aptitude. (See AR 672-73.) Dr. Monahan indicated that "no standard tests [were] conducted" to support her findings, however. (AR 669; see also AR 673 ("No specific tests performed.").) In a narrative report attached to the questionnaire, Dr. Monahan opined that based on a total of nine therapy sessions together (AR 675), Plaintiff had "Dissociative Identity Disorder with at least one other personality" (AR 684-87). Dr. Monahan indicated that there was "no exact test to determine if an individual has DID" and that this could be "explored further in future sessions." (AR 686.)

### iii. *Dr. Cross*

In April 2013, Plaintiff was evaluated by consulting psychologist Kara Cross. (AR 333-38.) Plaintiff complained of anxiety and depression. (AR 333.) On examination, Dr. Cross found that her thought processes were coherent and organized; her thought content was relevant, nondelusional, and not in response to "internal stimuli during the interview"; her mood and affect were "stable" but "somewhat anxious"; and she was alert and oriented. (AR 336.) Regarding her memory, Plaintiff was "able to repeat four digits forward and backward," "recall three items (House, Ball, Chair) immediately and . . . after five minutes,"

and "recall who George Washington was and a school day attended as a child." (Id.) Regarding her concentration, Plaintiff could "perform serial threes and serial sevens," knew that "4 dollars plus 5 dollars is 9 dollars," could "do alpha numeric reasoning," and followed the conversation "well." (Id.) Dr. Cross assessed her with a GAF score of 60 and deemed her condition "good." (AR 337.) She could understand, remember, and carry out "<u>simple</u> one or two-step job instructions" and "detailed and <u>complex</u> instructions" and was otherwise "unimpaired" with regard to such things as interacting with co-workers and the public, maintaining concentration and attention, and maintaining regular attendance. (AR 337-38 (emphasis in original).)

### 3. Analysis

Plaintiff argues that the ALJ improperly discounted her subjective symptom testimony by basing his analysis on her activities of daily living and an apparent "lack of treatment that [was] more aggressive." (J. Stip. at 26-27 (citing AR 29).) As discussed below, the ALJ erred as to the latter reason but did not otherwise err in his credibility analysis, offering two clear and convincing reasons for discounting her testimony: inconsistency with "activities of daily living" and lack of "support" in the objective medical evidence.[14] (See AR 29.)

_____

[14] The ALJ provided an additional reason for discounting Plaintiff's testimony, that there was "no evidence of [muscle] atrophy." (AR 29.) But the validity of that reason is "open to question." See Johnson v. Colvin, No. ED CV 15-1992-E, 2016 WL 1532227, at *4 (C.D. Cal. Apr. 15, 2016); see also Lapeirre-Gutt v. Astrue, 382 F. App'x 662, 665 (9th Cir. 2010) (rejecting "lack of muscle atrophy" as valid justification for discounting plaintiff's testimony because "no medical evidence suggests that high inactivity levels necessarily lead to muscle atrophy");

### a. *Daily Activities*

An ALJ may properly discount the credibility of a plaintiff's subjective symptom statements when they are inconsistent with her daily activities. See Molina, 674 F.3d at 1112. "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Id. at 1113. The ALJ here found that Plaintiff "ha[d] engaged in a somewhat normal level of daily activity and interaction" and that her "ability to participate in such activities diminishe[d] the credibility of her allegations of functional limitations." (AR 29); see Reddick, 157 F.3d at 722 (ALJ may discount subjective symptom statements when "level of activity [is] inconsistent with Claimant's claimed limitations").

Indeed, with regard to her alleged physical impairments, Plaintiff averred that she was unable to fully stand, walk, lift, or bend over (AR 226) or use her right hand or sit for very long (AR 57-58, 60-61). But the ALJ noted that she engaged in such activities as "preparing simple meals, driving, [and] shopping in stores" (AR 29), and those findings were supported by substantial

Valenzuela v. Astrue, 247 F. App'x 927, 929 (9th Cir. 2007) (ALJ erred in determining that "absence of evidence of muscular atrophy indicated that [plaintiff's] carpal tunnel syndrome was not as severe as [he] claimed" because "the record was devoid of any medical testimony to support that finding"). Here, Dr. Schmitter testified that one would expect "motor" or "muscle weakness" in someone with Plaintiff's complaints (AR 46, 49), lending medical support to the ALJ's reasoning. But because neither party has challenged or defended the ALJ's reasoning in this regard, the Court does not address it.

evidence in the record. Plaintiff herself reported and testified that she prepared her own meals (AR 228), "cook[ed]" (AR 64; see also AR 236, 335), and made breakfast, coffee, and lunch daily (see AR 335). She could and did drive a car by herself. (See AR 64, 229, 333, 335, 487.) And she shopped in stores, ran errands, went out alone, and regularly went outside to sit on the grass with her dogs. (See AR 229, 236, 335.) She also at one point during the relevant period traveled to San Diego with only her 16-year-old son. (AR 682.)

One examining doctor observed that she was "fully ambulatory and independent in all activities of daily living" (AR 486), and she was noted on more than one occasion to be exercising multiple times a week and engaging in "weight training and cardiovascular" activity at a gym (AR 487, 629; see also AR 646 (reporting that she was "increasing her activities" in May 2014)). Plaintiff's daily activities also involved taking care of her disabled husband, two children, and mother, over whom she had power of attorney. (See, e.g., AR 227, 328, 486, 510, 531-32, 536, 539, 542, 681.) The record even reflects that Plaintiff and her husband, who was receiving disability, got a "stipend" for Plaintiff to act as his "caretaker." (AR 510.) Moreover, her function report, in which she described how she couldn't independently cook or do household chores, was completed in April 2013 (see AR 228 ("family helps" with cooking and "does most of [the chores]"), the same month she reported to Dr. Cross that she had "no difficulty completing household tasks" and could cook and "take care of self-dressing, self-bathing, and personal hygiene" (see AR 335). Thus, the ALJ properly found that such extensive

activities of daily living undermined the credibility of Plaintiff's subjective symptom statements. See Ronquillo v. Colvin, No. CV 14-6702 JC, 2015 WL 5768348, at *7 (C.D. Cal. Sept. 30, 2015) (ALJ properly discounted plaintiff's credibility "because the alleged severity of his impairment was not consistent with [his] admitted level of activity," which included walking around the block, watching television, preparing meals, driving a car, shopping in stores, and "exercis[ing] 20 minutes 5 days per week at a moderate or strenuous level"); Thomas v. Colvin, No. CV 12-09915-VBK, 2013 WL 4517872, at *2 (C.D. Cal. Aug. 23, 2013) (ALJ properly discounted pain testimony given that plaintiff "was able to drive, and drove her father and helped him to prepare his meals; she engaged in physical therapy exercises every morning; she volunteered at her church and served breakfast or worked in a day care center checking the children; [and] she watched her grandchildren").

Regarding her mental impairments, Plaintiff alleged that she had problems with her memory, concentrating, and being around people. (AR 62-63, 231.) The ALJ found, however, that she "pa[id] bills, handl[ed] the finances, t[ook] her son to soccer practices, and spen[t] time with her family." (AR 29; see also AR 229 (reporting that she could pay bills, count change, handle savings account, and use checkbook or money order), 230 (reporting that she spent time with others, stayed home with family, saw her mother and father "once in a while," talked with her mother on phone three times a week, texted her "friends" to see how they were, and drove her son to soccer practice once a week).) Substantial evidence in the record supported those

findings.  (Compare AR 231 (reporting in Apr. 2013 that she had

problems "getting along with . . . others"), with AR 335

(reporting that same month to examining psychologist that she

managed money and had "excellent or good" relationships with

"family and friends"), and AR 486 (reporting in Apr. 2015 to

examining psychologist that she "manage[d] finances," "pa[id]

bills without problem," and "remember[ed] appointments"), and AR

549 (treating psychiatrist noting in Oct. 2015 that she always

"carrie[d] notes and her appointment book with her to remain

organized").)  Moreover, not only did she spend time with her

family, but she also had the mental capacity for helping her

mother with "legal issues regarding her home" (AR 531) and

endeavoring to get her son "medical care" for his own "mental

health problems" (AR 532).

   And despite Plaintiff's testimony that she was unable to

read or remember what she had read for more than "6 seconds"

because of her alleged cognitive impairments (see AR 63, 231),

she was noted throughout the record as reading books on mental-

health issues, such as ADD and "multiple personality" (AR 499

(book was "[her] new Bible"), 502, 540, 633; see also AR 488

(examining psychologist noting that she "was able to hear and

read instructions")), and being able to keep appointments and

manage her medications by herself (see, e.g., AR 486; see also AR

335 (Plaintiff reporting that she could "focus [her] attention"

and had "no difficulty making her decisions")).  The ALJ

therefore properly discounted Plaintiff's testimony based on her

extensive activities of daily living, and his determination was

supported by substantial evidence in the record.  See Womeldorf

v. Berryhill, 685 F. App'x 620, 621 (9th Cir. 2017) (upholding ALJ's discounting of plaintiff's credibility in part because his activities of daily living "were not entirely consistent with his claimed inability to engage in social interactions"); Lopez v. Colvin, No. 1:13-cv-00741-SKO, 2014 WL 3362250, at *16 (E.D. Cal. July 8, 2014) (ALJ did not err in discounting plaintiff's testimony because he "could sustain the concentration and memory to read, watch two to three hours of television, manage his personal finances, perform household chores, and prepare meals").

b. *Objective Medical Evidence*

Contradiction with evidence in the medical record is a "sufficient basis" for rejecting a claimant's subjective symptom testimony. Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008); see Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (upholding "conflict between [plaintiff's] testimony of subjective complaints and the objective medical evidence in the record" as "specific and substantial" reason undermining credibility). Although a lack of medical evidence "cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing § 404.1529(c)(2)).

In addition to the clear and convincing reason discussed above, the ALJ found that Plaintiff's subjective symptom statements were unsupported by the medical evidence. (AR 29.) Specifically, despite allegations of pain in her lower back that allegedly prevented her from working (see AR 56-57, 236),

34

Plaintiff had "only mild findings with regard to her back issues" (AR 29). For example, as the ALJ noted, medical imaging throughout the record indicated that Plaintiff's back presented as either "normal" or "mild[ly]" afflicted. (See id.; see also AR 373 (Sept. 2011 lumbar-spine x-ray showing "[n]o evidence of acute fractures, subluxation or significant disc narrowing"), 466-68 (Nov. 2011 MRI of lumbar spine showing "mild" findings at L4-L5 and L5-S1 disc levels), 464-65 (December 2012 MRI of cervical spine showing no evidence of "stenosis or disc herniation"), 461-63 (July 2013 MRI of thoracic spine showing no evidence of stenosis, neural foraminal narrowing, or disc herniation).) While findings on examination at times indicated tenderness to palpation of the back (see, e.g., AR 353, 356, 422, 645), they were also "normal," "mild," or showed negative straight-leg raises (see AR 29; see also, e.g., AR 422 (Oct. 2011: "no abnormality"), 370-71 (Nov. 2011: no tenderness), 361 (May 2012: "no specific tenderness"), 343-44 (May 2013: "mild tenderness to palpation" and negative straight-leg raises), 353 (Aug. 2013: negative straight-leg raises)). Moreover, her gait was frequently noted as "normal." (See, e.g., AR 422 (Oct. 2011), 345 (May 2013), 486-87 (May 2015: "fully ambulatory" and "fluid" gait).)

One orthopedic physician observed that Plaintiff's "subjective complaints of pain exceed[ed] objective findings" upon examination (AR 353), and during a neurosurgical consultation, Plaintiff's lumbar-spine disc bulges were found "not . . . severe enough . . . to be causing [her] current symptoms," especially given that her symptoms were on her left

35

side and the bulges were "more eccentric to the right" (AR 648). Thus, the ALJ's discounting of Plaintiff's complaints of back pain based on a dearth of supporting evidence in the record was premised on substantial evidence. Pierce v. Astrue, No. CV 09-8177 RNB, 2010 WL 2998887, at *1 (C.D. Cal. July 30, 2010) ("ALJ's adverse credibility determination was proper because it was supported by substantial evidence and was sufficiently specific to permit the Court to conclude that the ALJ did not arbitrarily discredit plaintiff's subjective testimony."). Even if alternative interpretations of the medical evidence exist, the Court will not "second guess" the ALJ's reasonable interpretation. Huntsman v. Colvin, No. EDCV 13-1300 JC, 2014 WL 808020, at *9 (C.D. Cal. Feb. 28, 2014) ("[T]he ALJ properly discounted plaintiff's credibility in part because plaintiff's pain allegations were not fully corroborated by the objective medical evidence."); see also Thomas, 278 F.3d at 959.

c.   *Lack of Aggressive Treatment*

As Plaintiff argues (see J. Stip. at 26-27), the ALJ may have erred in his characterization of the medical record as demonstrating a "lack of treatment that [was] more aggressive or [required] additional surgical intervention" (AR 29). Plaintiff received epidural steroid injections (see AR 358-59, 363-64, 366-67), was prescribed the narcotic Vicodin (see, e.g. AR 325, 646), and underwent spinal decompression surgery (see AR 554-55). Such treatment is aggressive. See Lapeirre-Gutt v. Astrue, 382 F. App'x 662, 664 (9th Cir. 2010) (treatment with narcotic pain medication, occipital nerve blocks, trigger-point injections, and cervical-fusion surgery not conservative); Samaniego v. Astrue,

36

No. EDCV 11-865 JC, 2012 WL 254030, at *4 (C.D. Cal. Jan. 27, 2012) (treatment not conservative when claimant was treated "on a continuing basis" with steroid and anesthetic "trigger point injections," occasional epidural injections, narcotic medication, and doctor recommended surgery).  On the other hand, the medical expert opined that there appeared to be no medical basis for Plaintiff's decompression surgery (AR 52), nor did the medical record support the severity of her alleged symptoms warranting such aggressive treatment, as discussed above (see AR 353 (Plaintiff's "many subjective complaints of pain exceed[ed] objective findings"), 648 (lumbar-spine disc bulges "d[id] not represent severe enough problem to be causing [Plaintiff's] current symptoms")).

Though the ALJ may have erred as to this reason, he provided at least two other clear and convincing reasons for discounting Plaintiff's subjective symptom testimony, inconsistency with daily activities and lack of support in the objective medical evidence, and thus any error was harmless.  See Larkins v. Colvin, 674 F. App'x 632, 633 (9th Cir. 2017) (citing Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004)). Remand is therefore unwarranted on this ground.

B.   The ALJ Properly Evaluated the Medical-Opinion Evidence

Embedded in her arguments regarding the ALJ's physical- and mental-impairment severity determinations, Plaintiff includes challenges to the ALJ's evaluation of the medical-opinion evidence.  (See generally J. Stip.)  She specifically contends that the ALJ erred in rejecting the opinion of Dr. Nabet (see id. at 20) and accepting the opinions of Drs. Schmitter and To (see

id. at 21) with regard to her physical impairments, and in rejecting the opinions of Drs. Bassanelli and Monahan (see id. at 8-10) and accepting the opinion of Dr. Cross (see id. at 15-17) as to her mental impairments.

### 1. Applicable law

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. Lester, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's. Id.; see § 404.1527(c)(1).[15] This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. Smolen, 80 F.3d at 1285. But "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522

---

[15] Social Security regulations regarding the evaluation of opinion evidence were amended effective March 27, 2017. When, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision. See Lowry v. Astrue, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); Spencer v. Colvin, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking."). Accordingly, citations to 20 C.F.R. § 404.1527 are to the version in effect from August 24, 2012, to March 26, 2017.

38

(9th Cir. 1996) (per curiam) (as amended). Moreover, because a testifying medical expert is subject to cross-examination, his opinion may be given greater weight. Andrews v. Shalala, 53 F.3d 1035, 1042 (9th Cir. 1995).

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see Carmickle, 533 F.3d at 1164. When a doctor's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for "clear and convincing" reasons. Magallanes, 881 F.2d at 751; Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). The weight given a treating or examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. § 404.1527(c)(3)-(6). Those factors also determine the weight afforded the opinions of nonexamining physicians. § 404.1527(e). The ALJ considers findings by state-agency medical consultants and experts as opinion evidence. Id.

Furthermore, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas, 278 F.3d at 957; accord Batson, 359 F.3d at 1195. An ALJ need not recite "magic words" to reject a physician's opinion or a portion of it; the court may draw "specific and legitimate inferences" from the ALJ's opinion. Magallanes, 881 F.2d at 755. "[I]n interpreting

39

the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'" Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).

The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

2. Analysis

The ALJ afforded "great weight" to the opinions of Drs. Schmitter, To, and Cross (AR 26, 31) and "little weight" to Drs. Nabet's, Bassanelli's, and Monahan's (AR 26, 31-32). As both parties apparently concede (J. Stip. at 8, 20), the ALJ was required to provide only a "specific and legitimate reason" for rejecting the latter, see Carmickle, 533 F.3d at 1164. He did.

a. *Drs. Nabet, Schmitter, and To*

Dr. Nabet opined that Plaintiff "was limited to a narrow range of sedentary work" (AR 31; see also AR 662-66), while Drs. Schmitter and To opined that she was instead capable of performing "medium work" (AR 31; see also AR 45, 340-47). The ALJ rejected Dr. Nabet's opinion, explaining that it was inconsistent with Plaintiff's "x-ray examination of the lumbar spine, which showed normal findings," and "records reflecting that [her] strength was normal in the lower extremities[] and her straight leg raise test was negative." (AR 31-32.) Dr. To's opinion, by comparison, was consistent with the same evidence (see AR 31), and similarly Dr. Schmitter's opinion was

40

"consistent with the objective medical evidence" — specifically, an "MRI examination of the lumbar spine, which revealed mild findings," and "records reflecting that [Plaintiff] exhibited no lumbar spine tenderness." (Id.) The ALJ afforded those opinions more weight than Dr. Nabet's. (See id.)

Plaintiff contends that the ALJ erred in his analysis because Dr. Nabet's opinion was "in agreement" with the medical record while the opinions of Drs. Schmitter and To were not. (J. Stip. at 20-21.) The ALJ, Plaintiff argues, "cherry-picked" evidence from the record to support his decision. (Id. at 20.) The ALJ, however, did not err, and his evaluation of their opinions was supported by substantial evidence in the record. See Lester, 81 F.3d at 831 (ALJ may reject medical-source opinion in favor of conflicting physician's opinion as long as that determination is "supported by substantial record evidence" (emphasis in original) (citation omitted)).

Dr. Nabet saw Plaintiff in December 2015 and completed her opinion just a month later.[16] (Compare AR 658-61, with 662-66; see also Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (factors in assessing physician's opinion include length of treatment relationship, frequency of examination, and nature and extent of treatment relationship); accord § 404.1527(c)(2). Though she assessed Plaintiff with a severely limited, sedentary RFC, she saw her only for arm and shoulder pain. (See AR 658-66.) A right-shoulder MRI she ordered at the time showed "mild findings" of bursitis and tendinosis, and she found some pain and

[16] Although Dr. Nabet stated that she began seeing Plaintiff in October 2014 (AR 662), no earlier records support that.

41

tenderness in her shoulders and right elbow.  (AR 650-51, 655.)
She found no tenderness in her neck, spine, or abdomen, however
(AR 655, 660), and observed that she had "no difficulty walking"
(AR 652).

Despite those findings, she nonetheless concluded that
Plaintiff could not perform "even 'low stress' jobs" or "sit and
stand/walk" for more than two hours in an eight-hour workday.
(See AR 663-64.)  But that opinion was inconsistent with
treatment notes throughout the record — including her own, as
pointed out above — demonstrating mild or normal findings (see AR
31; see also AR 373 (Sept. 2011 x-ray revealing "[n]o evidence of
acute fractures, subluxation or significant disc space narrowing"
in lumbar spine), 466-68 (Nov. 2011 MRI revealing "mild decreased
disc height loss," "partial disc desiccation," "disc bulge with
. . . mild bilateral ligamentum flavum buckling," and "[m]ild
bilateral reactive facet arthropathy" in lumbar spine), 299-300
(Oct. 2012 EMG nerve-conduction study revealing "mild ulnar
neuropathy"), 464-65 (Dec. 2012 MRI revealing no "stenosis or
disc herniation" in cervical spine), 360 (June 2013 x-ray
revealing "essentially normal-looking cervical and lumbar
spine"), 461-63 (July 2013 MRI revealing "no evidence [of]
stenosis, neural foraminal narrowing, or disc herniation" in
thoracic spine), 571 (Aug. 2014 MRI revealing "[m]ild bilateral
foraminal narrowing" and "no evidence" of stenosis in lumbar
spine), 650-51 (Jan. 2016 MRI revealing "mild" bursitis and
tendinosis in right shoulder)); Ruckdashel v. Colvin, 672 F.
App'x 745, 745-46 (9th Cir. 2017) (as amended) (finding that ALJ
"provided specific and legitimate reasons, supported by

42

substantial evidence, for rejecting" treating physician's opinion, including that it was "conclusory" and "contradicted by the objective medical evidence"); Clay v. Astrue, No. CV 12-1881 RNB, 2013 WL 550494, at *3 (C.D. Cal. Feb. 11, 2013) ("[T]he ALJ noted that [treating physician's] conclusions were not adequately supported by clinical data and diagnostic findings, including [his] own treatment notes[.]").

Indeed, as identified by the ALJ, Plaintiff was frequently found to have normal strength in her lower extremities and negative straight-leg raises. (See AR 32; see, e.g., AR 422 (Oct. 2011), 418-20 (Nov. 2011), 297 (Sept. 2012), 313 (Jan. 2013), 344 (May 2013), 356 (June 2013), 353 (Aug. 2013), 582 (Nov. 2013), 645 (July 2015).) The ALJ therefore properly rejected Dr. Nabet's opinion as inconsistent with the medical evidence. See Kohansby v. Berryhill, 697 F. App'x 516, 517 (9th Cir. 2017) (upholding inconsistency with medical evidence as specific and legitimate reason for rejecting medical opinion (citing Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008))); Bailey v. Colvin, 659 F. App'x 413, 415 (9th Cir. 2016) (inconsistency with "own treatment records" and objective medical evidence constitutes "specific and legitimate" reason for rejecting treating physician's opinion).

Dr. To examined Plaintiff in May 2013 and assessed her with a medium RFC. (See AR 340-47.) On examination, he found that she had "5/5" muscle strength in her upper and lower extremities (AR 344), "normal" gait (AR 345), and "negative" straight-leg raises (AR 344). Those findings were consistent with the medical evidence of record, as laid out above, and thus the ALJ did not

43

err in his evaluation of Dr. To's opinion.

Dr. Schmitter reviewed Plaintiff's medical record and testified at her January 2016 hearing, finding no "significant orthopaedic pathology" or support in the record for an RFC that was less than medium. (AR 43-52.) As discussed by the ALJ, his opinions were "reasonable and consistent with the objective medical evidence." (AR 31.) For example, the ALJ identified how Plaintiff's August 2014 MRI "revealed mild findings" (id.; see also, e.g., AR 373 (Sept. 2011), 466-68 (Nov. 2011), 299-300 (Oct. 2012), 464-65 (Dec. 2012), 360 (June 2013), 461-63 (July 2013), 569-71 (Aug. 2014), 650-51 (Jan. 2016)), and her treatment records frequently demonstrated "mild" or no lumbar-spine tenderness (AR 31; see also, e.g., AR 422 (Oct. 2011), 371 (Nov. 2011), 361 (May 2012), 330 (Dec. 2012), 343 (May 2013), 353 (Aug. 2013), 645 (July 2015), 660 (Dec. 2015), 655 (Jan. 2016)).

Plaintiff argues, however, that Dr. Schmitter "completely ignored" an MRI of her spine indicating facet arthropathy, a disc bulge, and "moderate to severe" stenosis at the L4-5 disc level (see AR 466-68 (Nov. 2011)) and an MRI of her spine identifying "reactive changes" that "could represent specific pain generators" (see AR 569-71 (Aug. 2014)). (J. Stip. at 18 (citing AR 361, 467, 570-71).) But Plaintiff is mistaken; Dr. Schmitter reviewed that evidence (see AR 43 (testifying that he read exhibits "1 through 26-F," or AR 281 through 661)) and addressed those specific medical-image findings at the hearing (see AR 47-52).

For instance, Dr. Schmitter explicitly mentioned Plaintiff's August 2014 MRI in justifying his opinion, stating that it

44

"showed no evidence of stenosis" (AR 44), and discussed the
November 2011 MRI in response to questioning from Plaintiff's
counsel (AR 50-51). He testified that that MRI contained
"normal" findings. (AR 51 (stating that they were "as normal as
you can get").) Moreover, he discussed its note regarding
"compression in the bilateral descending L5 nerve root" and
explained that without corroborating evidence of "neurological
deficits," it was only a "potential problem." (Id.) "If there
were pressure on the L5 nerve root on the left," he stated,
"there should be corresponding examination findings resulting in
L5 motor weakness," but he "could find" none. (Id.) Indeed, as
discussed by the ALJ (AR 31), Dr. Schmitter's opinion was
consistent with medical evidence throughout the record
demonstrating normal muscle strength (see e.g., AR 422, 418-20,
297, 313, 344, 356, 353, 582, 645), lack of or mild spinal
tenderness (see, e.g., AR 422, 371, 361, 330, 343-44, 353, 645,
660, 655), and "mild" imaging results (see, e.g., AR 373, 466-68,
299-300, 464-65, 360, 461-63, 569-71, 650-51). The ALJ was
entitled to rely on the doctor's opinion.

Plaintiff points to a June 2015 treatment note indicating
that she had "decreased sensation to light touch and pinprick
over [her left] foot" and argues that Dr. Schmitter also
"ignored" this evidence. (See J. Stip. at 18; AR 643.) But
Plaintiff's argument is misplaced. Though Dr. Schmitter did not
specifically mention the treatment note at the hearing, he
nonetheless indicated that he reviewed the entire record, which
included it. Moreover, the note's significance is questionable.
The attending physician who observed Plaintiff's apparent

"decreased sensation" also found that she had a "negative Tinel sign"[17] and "no evidence of compression of her [peroneal] nerve" according to a recent CT scan. (AR 643.) The doctor "did not believe her nerve [was] being compressed" or that "she would benefit from any decompression" surgery. (Id.) A month later, Plaintiff was seen again, demonstrated "greater than 3/5" strength in her lower extremities and "normal" gait, and was assessed as having no "clear-cut etiology" for her pain symptoms. (AR 645.)

Plaintiff also points to an October 2015 neurosurgical consultant's "recommendation" for nerve-decompression surgery, which Dr. Schmitter allegedly also ignored. (See J. Stip. at 19; AR 647-49.) Dr. Schmitter did not specifically mention that recommendation at the hearing, but as discussed above, he indicated that he reviewed the entire record, which included the neurosurgical consultation. The significance of the evidence is again questionable. That examining physician reviewed Plaintiff's August 2014 MRI, which he noted as showing no "significant stenosis" and only "mild" disc bulges. (AR 648.) He opined that those bulges "d[id] not represent [a] severe enough problem to be causing [her] symptoms" and were "more eccentric to the right at L4-5" even though her "symptoms [were] on the left." (Id.) Believing her "entire pathology in the left leg [to be] peripheral in origin," he stated that she "would

---

[17] The Tinel's sign test indicates that a nerve is irritated; a positive Tinel's sign occurs when light tapping over the nerve elicits a tingling sensation. Medical Definition of Tinel's Sign, MedinceNet.com, https://www.medicinenet.com/ script/main/art.asp?articlekey=16687 (last updated May 13, 2016).

potentially benefit" from pelvic and perineal-nerve decompression surgeries. (Id.) He also "advised her of [other] potential surgical treatment[s]." (AR 648-49.) He did not in fact "recommend" surgery.

Thus, the ALJ's reliance on Dr. Schmitter's opinion was reasonable and supported by substantial evidence in the record. The ALJ therefore did not err in his evaluation of the opinions of Drs. Nabet, To, and Schmitter.

b. *Drs. Cross, Bassanelli, and Monahan*

Drs. Bassanelli and Monahan completed mental-evaluation forms indicating that Plaintiff had "severe lack of attention and focus" and "significant memory impairments" and could not perform even low-stress jobs (AR 543-50, 668-86), while Dr. Cross opined that she could understand, remember, and carry out simple as well as complex instructions and was otherwise "unimpaired" (AR 333-38). The ALJ rejected the opinions of Drs. Bassanelli and Monahan because they were inconsistent with "records reflecting that the claimant's cognition and memory were intact," "her insight and judgment were appropriate," and her "memory and impulse control were good, affect was stable, and insight and judgment were fair." (AR 26-27.) By contrast, Dr. Cross's opinion was afforded more weight because it was consistent with the same evidence as well as evidence of her daily activities, which included "preparing simple meals, driving, shopping in stores, paying bills, handling the finances, taking her son to soccer practices, and spending time with her family." (AR 26.)

Plaintiff argues that the ALJ erred because Drs. Bassanelli and Monahan had "long-standing treatment relationships" with her

47

and their opinions were supported by the "evidence as a whole."
(J. Stip. at 8-9.)  Dr. Cross's opinion, moreover, was allegedly
inconsistent with the medical evidence (id. at 17), "did not have
the benefit of over two years of treatment records" (id. at 16),
did not involve "detailed psychological testing" (id.), and was
"internally inconsistent" (id.).  The ALJ, however, did not err,
and his evaluation of their opinions was supported by substantial
evidence in the record.  See Lester, 81 F.3d at 831.

As discussed above, inconsistency with objective medical
evidence is a specific and legitimate reason for discounting a
treating physician's opinion, Batson, 359 F.3d at 1195; Kohansby,
697 F. App'x at 517, and the ALJ here properly rejected the
opinions of Drs. Bassanelli and Monahan — and credited Dr.
Cross's — for this reason.  Plaintiff's cognition and memory were
frequently noted — often by Drs. Bassanelli and Monahan
themselves — as being "intact" or "good" (see, e.g., AR 391 (Aug.
2013), 517 (Jan. 2014), 635 (Jan. 2015), 631 (Mar. 2015), 627
(same), 623 (Apr. 2015), 619 (May 2015), 615 (same), 608 (Aug.
2015), 604 (Sept. 2015), 600 (same), 538-40 (Oct. 2015)) and her
insight and judgment as "appropriate," "fair," "intact,"
"preserved," "adequate," or "normal" (see, e.g., AR 337 (Apr.
2013), 635 (Jan. 2015), 627 (Mar. 2015), 631 (same), 623 (Apr.
2015), 615 (May 2015), 619 (same), 608 (Aug. 2015), 600 (Sept.
2015), 604 (same)).  See Woodmass v. Berryhill, 707 F. App'x 432,
435 (9th Cir. 2017) (inconsistency with own treatment notes and
other medical evidence constitutes "specific and legitimate"
reason for discounting treating physician's opinion).

Indeed, in 2015, following a series of psychological tests

48

administered by Dr. Chatigny, Plaintiff was found to have a
normal neuropsychological profile, with the "capacity for full
independence across all arenas of cognition," the "capacity for
memory and new learning," and "broad integrity of brain function
and intellectual/cognitive abilities that [were] commensurate
with the majority of others of similar age." (AR 488, 492.)
Specifically with regard to memory, though inconsistences were
noted, Plaintiff's performance on "complex tasks of visual and
auditory memory" was "[a]verage" and her acquisition of a "14-
item unrelated word-pair list" was "[a]verage," with "good
learning noted across four learning trials." (AR 490.) Her
immediate and delayed recall of "abstract visual designs" was
"[a]verage." (Id.) In a visual learning task, she could "recall
9 of 10 blocks and accurately note the location of 8 blocks."
(Id.) And her "Auditory and Visual Memory composite index
scores" and "Immediate and Delayed Memory scores" were within the
"[a]verage" range. (Id.)

Plaintiff contrasts her 2015 psychological testing with that
completed by Dr. Cross, which she argues was "perfunctory," not
"detailed," and without "the benefit of over two years of
treatment records." (See J. Stip. at 16-17.) But Dr. Cross
completed several tests (see AR 333 ("Testing Administered:
Complete Mental Evaluation"); see also AR 335-37 (tests completed
for memory, fund of knowledge, concentration and calculation,
judgment and reasoning, and similarities and differences)), and
the results of Dr. Cross's and Dr. Chatigny's testing were
consistent with each other, regardless of their different
approaches. (Compare AR 337 (Dr. Cross concluding that

49

Plaintiff's condition was "good"), with AR 492 (Dr. Chatigny

concluding that Plaintiff's neuropsychological profile was

"[n]ormal").)  Dr. Cross's examination findings supported her

opinion and provided a legitimate basis for the ALJ's discounting

of Plaintiff's treating physicians, see Batson, 359 F.3d at 1195

(ALJ properly discounted treating physician's opinion in part

because it conflicted with "consultative medical evaluation"

completed by examining physician, who determined that plaintiff

was "objectively able to work"), and it thus is irrelevant that

she completed fewer tests than Dr. Chatigny[18] or that she was

only an examining rather than a treating physician, as Plaintiff

argues, see Thomas, 278 F.3d at 957 ("Although the treating

physician's opinion is given deference, the ALJ may reject the

opinion of a treating physician in favor of a conflicting opinion

of an examining physician if the ALJ makes 'findings setting

forth specific, legitimate reasons for doing so that are based on

substantial evidence in the record.'" (citing Magallanes, 881

F.2d at 751)).

Moreover, Dr. Cross's opinion was not internally

inconsistent simply because the GAF score of 60 she assigned

Plaintiff denotes "moderate symptoms" whereas she assessed only

mild limitations.  (See J. Stip. at 16.)  GAF scores do not have

---

[18] Dr. Monahan apparently conducted no testing (see AR 529-42, 668-86; see also AR 669 ("no standard tests conducted" on "intellectual functioning"), 673 ("no specific tests performed"), 686 (Dr. Monahan acknowledging that she did not employ known "screening tools" to test Plaintiff for Dissociative Identity Disorder but still diagnosed it)) but Plaintiff nonetheless argues that her opinion should have been given substantial weight (J. Stip. at 9).

a "direct correlation" to Social Security severity requirements, Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50764-65 (Aug. 21, 2000) (codified at 20 C.F.R. pt. 404), and "should not be considered in isolation." Richard C. Ruskell, Social Security Disability Claims Handbook § 2:15 n.40 (2017). Moreover, a score of just one point higher, 61, would indicate "mild" symptoms or "some" difficulty in social, occupational, or school functioning but that Plaintiff was "generally functioning pretty well," with "some meaningful interpersonal relationships." See Diagnostic and Statistical Manual of Mental Disorders 32 (revised 4th ed. 2000). As discussed above, Dr. Cross's findings were supported by both the record and her own examination findings, undermining Plaintiff's argument that the alleged inconsistency constituted reversible error.

Finally, the ALJ discussed Plaintiff's daily activities (AR 26), which was another specific and legitimate reason for favoring Dr. Cross's opinion over those of Drs. Bassanelli and Monahan. See Ghanim v. Colvin, 763 F.3d 1154, 1162 (9th Cir. 2014); Morgan, 169 F.3d at 600-02; Fisher v. Astrue, 429 F. App'x 649, 652 (9th Cir. 2011). Plaintiff herself reported that she could manage her finances (see AR 229), spend time with family and friends (see AR 230), and shop in stores (see AR 229). Such activities were corroborated by similar statements made to her physicians, who noted that she managed her finances (see, e.g. AR 335, 486), had "excellent or good" relationships with "family and friends" (see, e.g., AR 335, 683 ("[The] whole family . . . rallied to care for each other.")), had power of attorney over

her mother and helped with "legal issues" (see, e.g., AR 531, 536, 539, 542, 681), was paid to care for her disabled husband (see, e.g., AR 328, 486, 532, 536), cared for her adult son with mental issues (see, e.g., AR 532), and read books (see, e.g., AR 499, 502, 540, 633). See Hunt v. Colvin, 954 F. Supp. 2d 1181, 1189-90 (W.D. Wash. 2013) (finding that ALJ's rejection of consulting examiner's opinion as inconsistent with daily activities was properly supported by ALJ's citation to plaintiff's self-reported activities and her report of "similar tasks during a consultative examination"). Plaintiff has not challenged the ALJ's reasoning in this regard (see generally J. Stip.), and these activities stand in sharp contrast to the doctors' opinions that Plaintiff was incapable of performing even low-stress jobs.

Plaintiff contends that Dr. Cross's opinion should not have been "construed as substantial evidence" because she was not provided with any of Plaintiff's medical records (see J. Stip. at 15-16 (citing § 404.1517 and Alcazar v. Comm'r of Soc. Sec., No. 2:15-cv-2203-KJN, 2017 WL 1275293, at *4 (E.D. Cal. Apr. 4, 2017))), but that argument is unavailing. Section 404.1517 requires only that a consulting examiner be given "necessary background information" about a claimant's condition. See Uy v. Colvin, No. 1:13-cv-1210 BAM, 2015 WL 351438, at *6 (E.D. Cal. Jan. 26, 2015) ("Social Security regulations do not require that a consulting physician review all of the claimant's background records."). In April 2013, when Plaintiff met with Dr. Cross, no mental-health records from the relevant period up to that point existed, and few such records existed at all. (See, e.g., AR

441-42 (Aug. 2010: earliest record concerning mental health, physician's assistant noting that Plaintiff's "anxiety seems better today than in the past"), 398-401 (May 2013: earliest record from relevant period concerning mental health, noting Plaintiff's report to family-medicine practitioner of "chronic anxiety" over her father being "in hospice w[ith] sudden liver disease").) Moreover, during the examination, Dr. Cross reviewed Plaintiff's psychiatric history with her, and she recounted never having been hospitalized for mental-health reasons and that she had had "counseling services off and on since the age of 4." (AR 334.) Thus, Dr. Cross's failure to review medical records was not contrary to law. See Cisneros v. Colvin, No. 1:12-cv-0931-BAM, 2013 WL 5375490, at *6 (E.D. Cal. Sept. 24, 2013) (no error when consulting examiner did not review records that were "irrelevant" or did not "shed much light on the claimant's levels of function as of [the onset date]"); Guerrero v. Colvin, No. 1:12-cv-1100 GSA, 2013 WL 4517915, at *6 (E.D. Cal. Aug. 26, 2013) (finding that ALJ properly relied on consulting examiner who had "legitimate basis for her opinion" despite having reviewed "no medical records" because she took plaintiff's medical history and conducted evaluation, and plaintiff "fail[ed] to identify which relevant records [she] should have reviewed and how the purported failure to review particular records prejudiced [the] consultative examination").

Viewed another way, "the failure to provide prior records . . . may be harmless when the record as a whole is considered." Alcazar, 2017 WL 1275293, at *4. As already discussed, Dr. Cross's opinion, though not based on a review of Plaintiff's

53

records, was nonetheless consistent with the results of her own psychological testing and the objective medical evidence as a whole. See Castaneda v. Astrue, 344 F. App'x 396, 398 (9th Cir. 2009) (ALJ did not err in relying on consulting examiner's assessment, which "rested on his own independent examination of [plaintiff] and was consistent with the record as a whole"); Brown v. Colvin, No. 2:15-cv-0293-KJN, 2016 WL 362232, at *5 (E.D. Cal. Jan. 29, 2016) (finding that ALJ properly relied on consulting examiner's opinion because it was supported by "his own clinical findings," other medical-opinion evidence, and "medical record as a whole"); Moreno v. Colvin, No. EDCV 12-0747 RNB, 2013 WL 1661566, at *3 (C.D. Cal. Apr. 16, 2013) (reversal not warranted because consulting examiner "conducted a thorough examination resulting in independent clinical findings and reached an opinion about plaintiff's functional limitations that was generally consistent with plaintiff's medical record"). Thus, any error was harmless, and Dr. Cross's opinion was properly considered substantial evidence. See Perry v. Astrue, No. 2:11-cv-3121-KJN, 2012 WL 6555074, at *6 (E.D. Cal. Dec. 14, 2012) ("[A]ny failure to provide plaintiff's prior treatment records to [consulting examiner] was harmless error, because [treating physician's] records contain minimal clinical findings concerning plaintiff's mental impairments, and . . . [other mental-health] records document findings that are generally consistent with those of [the consulting examiner].")

Accordingly, remand is unwarranted on this ground.

C. **The ALJ Properly Evaluated the Severity of Plaintiff's Alleged Impairments**

Plaintiff argues that the ALJ erred in finding her peripheral nerve-entrapment syndrome "non-severe" (J. Stip. at 19) and in finding no severe mental impairment (id. at 4-8). For the reasons discussed below, the ALJ did not err in either regard.

1. **Applicable law**

The step-two inquiry is "a de minimis screening device to dispose of groundless claims." Smolen, 80 F.3d at 1290. The claimant has the burden to show that she has one or more "severe" medically determinable impairments that can be expected to result in death or last for a continuous period of at least 12 months, as demonstrated by evidence in the form of signs, symptoms, or laboratory findings. See §§ 404.1505, 404.1520(a)(4)(ii); Ukolov v. Barnhart, 420 F.3d 1002, 1004-05 (9th Cir. 2005); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). A medically determinable impairment is "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."[19] § 404.1520(c); see also § 404.1521(a). "An impairment or combination of impairments may be found 'not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (quoting

---

[19] "Basic work activities" include, among other things, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling" and "[c]apacities for seeing, hearing, and speaking." § 404.1521(b); accord Yuckert, 482 U.S. at 141.

Smolen, 80 F.3d at 1290 (emphasis in original)).  A court must determine whether substantial evidence in the record supported the ALJ's finding that a particular impairment was not severe. Davenport v. Colvin, 608 F. App'x 480, 481 (9th Cir. 2015) (citing Webb, 433 F.3d at 687); see also Kent v. Astrue, 335 F. App'x 673, 674 (9th Cir. 2009) (same).

      2.   Analysis

         a.   *Peripheral Nerve-Entrapment Syndrome*

    The ALJ found that Plaintiff's "peripheral nerve entrapment syndrome cause[d] only a slight abnormality that would have no more than a minimal effect on her ability to work." (AR 24.) The ALJ reasoned that "no objective medical evidence" showed that the condition lasted or would last for a "continuous period of not less than 12 months"; further, the condition was "managed medically" and "[n]o aggressive treatment was recommended" for it.  (Id.)

    Plaintiff argues that "the medical evidence and [her] testimony" supported a finding of severity, specifically identifying three medical records: a September 2012 diagnosis of "ulnar neuropathy versus cervical radiculopathy on the right side" (see AR 297-98); an October 2012 electrodiagnostic study showing "mild ulnar neuropathy" (see AR 299-300); and a January 2013 treatment note indicating a "positive" Tinel's sign on the right ulnar nerve (see AR 313).  (J. Stip. at 19-20.)  As to her testimony, she stated at her January 2016 hearing that she "had difficulty using her right arm and hand and experienced burning pain in her elbow area when writing or typing." (Id. at 20 (citing AR 57-58).)

The ALJ, however, correctly found that the objective medical evidence did not support a finding of severity. Her diagnosis for peripheral nerve-entrapment syndrome was made in January 2016 by Dr. Nabet. (See AR 655.) Her opinion was properly discounted by the ALJ, as discussed above; indeed, just a month before that diagnosis Plaintiff was observed as having no tenderness in her elbows and "intact" range of motion in her extremities (see AR 660). Moreover, despite the evidence of "mild ulnar neuropathy" in late 2012 and early 2013, Dr. Schmitter, whose opinion the ALJ properly afforded great weight, noted that such a finding was "common." (AR 46 (also indicating that Plaintiff had "normal nerve examination" in June 2015).) Around that same time, Plaintiff's December 2012 examination at an arthritis clinic revealed that she had "normal range of motion" in her upper extremities and no swelling or tenderness in her elbows or wrists. (AR 330.) The only treatment she received following that examination was a prescription for Effexor to control her "stress level." (AR 331.) Even if Plaintiff had a positive Tinel's sign in January 2013, nothing in the record indicates that the nerve irritation lasted for the requisite 12 months, as the ALJ concluded (AR 24).

Though Plaintiff also points to her testimony of difficulty using her right hand, the ALJ properly discounted her subjective symptom testimony, as discussed above. And at a consultative examination in May 2013, she was shown to have grip strength "commensurate with [normal] motor strength." (AR 344.) She had "no significant deformities" in her hands, could "manipulate the use of a pen with ease," did "not restrict the use of either hand

during the examination," could "approximate fingers and make a fist without difficulties bilaterally," and achieved adequate "[p]inch positioning" bilaterally. (Id.) And as already noted, her activities of daily living included many things requiring the use of her hands, such as driving a car (AR 64, 229, 333, 335, 487) and weight-lifting (AR 487 (May 2015)).

Substantial evidence therefore supported the ALJ's severity determination as to Plaintiff's alleged peripheral nerve-entrapment syndrome. See Delanoy v. Berryhill, 697 F. App'x 917, 919 (9th Cir. 2017) ("The ALJ properly relied on the absence of record medical evidence sufficient to support a determination that [plaintiff's] migraines did not cause more than minimal limitation in [his] ability to perform basic work activities."); accord Neeley v. Berryhill, 693 F. App'x 641, 642 (9th Cir. 2017).

### b. *Mental Impairments*

The ALJ found that Plaintiff had the "medically determinable mental impairments of anxiety and depression" but that they did "not cause more than minimal limitation in [her] ability to perform basic mental work activities and [were] therefore nonsevere." (AR 24.) Plaintiff argues that the ALJ improperly rejected the opinions of Drs. Bassanelli and Monahan to support his analysis here (see J. Stip. at 8-10), but as discussed above, the ALJ properly discounted their opinions and correctly afforded Dr. Cross's opinion "great weight." See Frantz v. Comm'r of Soc. Sec. Admin., No. CV-16-04048-PHX-GMS, 2017 WL 3188418, at *4 (D. Ariz. July 27, 2017) ("The inconsistencies between the objective medical evidence and [physician's] treating records and his

ultimate opinion as well as the contradictions between his
opinion and the findings of the other physicians 'provides
substantial evidence to find that the medical evidence clearly
established the claimant's lack of a medically severe impairment
or combination of impairments.'" (citing <u>Webb</u>, 433 F.3d at 688)
(alterations omitted)).

Plaintiff further argues that the ALJ "mischaracterized" the
medical evidence in making his mental severity determination, but
substantial evidence in the record demonstrates that despite her
alleged mental impairments, she had "intact" or "good" cognition
and memory (<u>see, e.g.</u>, AR 391 (Aug. 2013), 517 (Jan. 2014), 635
(Jan. 2015), 631 (Mar. 2015), 627 (same), 623 (Apr. 2015), 619
(May 2015), 615 (same), 608 (Aug. 2015), 604 (Sept. 2015), 600
(same), 538-40 (Oct. 2015)) and "appropriate," "fair," "intact,"
"preserved," or "normal" insight and judgment (<u>see, e.g.</u>, AR 337
(Apr. 2013), 635 (Jan. 2015), 627 (Mar. 2015), 631 (same), 623
(Apr. 2015), 615 (May 2015), 619 (same), 608 (Aug. 2015), 600
(Sept. 2015), 604 (same)).  She also managed her own finances
(<u>see</u> AR 229, 335, 486); spent time with family and friends
(<u>see</u> AR 230, 335); had power of attorney over her mother, whom
she helped with "legal issues" (<u>see, e.g.</u>, AR 531, 536, 539, 542,
681); was paid to care for her disabled husband (<u>see, e.g.</u>, AR
328, 486, 532, 536); cared for her adult son with mental issues
(<u>see, e.g.</u>, AR 532); and read books (<u>see, e.g.</u>, AR 499, 502, 540,
633).  As the ALJ found, Plaintiff experienced only "mild"
limitations in her activities of daily living, social
functioning, and concentration, persistence, and pace and had
never experienced an episode of decompensation.  (AR 25); <u>see</u>

<u>Cosgrove v. Berryhill</u>, No. EDCV 16-2551 JC, 2017 WL 5054658, at
*3 (C.D. Cal. Oct. 31, 2017) (finding that "substantial evidence
support[ed] the ALJ's step two determination" because plaintiff's
daily activities, social functioning, and concentration,
persistence, and pace were at most "mild[ly]" limited and she had
no episodes of decompensation).

Accordingly, the ALJ did not err in his severity
determination and remand is unwarranted on this ground.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42
U.S.C. § 405(g),[20] IT IS ORDERED that judgment be entered
AFFIRMING the Commissioner's decision, DENYING Plaintiff's
request for remand, and DISMISSING this action with prejudice.


DATED: March 29, 2018

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[20] That sentence provides: "The [district] court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."